605 F.2d 1283
 Alonie BALLARD and Lula Hamilton, on their own behalf and on
behalf of all others similarly situated,
Plaintiffs-Appellees,
v.
ROCKVILLE CENTRE HOUSING AUTHORITY, Rosalie U. Rosenberger,
as Chairperson ofthe Rockville Centre Housing Authority, and
Lee Goodwin, Commissioner of theDivision of Housing and
Community Renewal of the State of New York, Defendants-Appellants.
 Nos. 635, 788, Dockets 78-7571, 78-7643.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1979.
Decided Aug. 30, 1979.
 
 James T. Rochford, Mineola, N. Y. (James F. Oliviero, Meyer, English, Cianciulli & Peirez, P. C., Mineola, N. Y., of counsel), for defendants-appellants Rockville Centre Housing Authority and Rosalie U. Rosenberger, Chairperson of the Rockville Centre Housing Authority.
 A. Seth Greenwald, Asst. Atty. Gen. of the State of New York, New York City (Robert Abrams, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendant-appellant Lee Goodwin, Commissioner of the Division of Housing and Community Renewal of the State of New York.
 Leonard S. Clark, Hempstead, N. Y. (Nassau/Suffolk Law Services Comm. Inc., Hempstead, N. Y., of counsel), for plaintiffs-appellees.
 Before WATERMAN, MANSFIELD and TIMBERS, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In this action by two tenants of low-income housing brought pursuant to 42 U.S.C. § 1983 the Rockville Centre Housing Authority (the Authority), its Chairperson (Rosenberger) and the Commissioner of the New York State Division of Housing and Community Renewal (Goodwin) appeal from an order of the District Court for the Eastern District of New York, entered by Judge Mark A. Costantino on October 19, 1978, upon plaintiffs' motion for summary judgment, declaring unconstitutional the Authority's schedule of rents to be charged in its public low-income housing projects to low income non-welfare families who have welfare recipients in their households and the New York State regulation pursuant to which the schedule was adopted, 9 N.Y.C.R.R. § 1627-2.6(c)(5)(ii), on the ground that they deny such tenants equal protection of law in violation of the Fourteenth Amendment. We remand for further proceedings.
 
 
 2
 The N.Y. Public Housing Law (the Law), 44A McKinney's Consol. Laws of N.Y., pursuant to which the regulation and rent schedule here under attack were promulgated, was passed to enable the State, with the cooperation of the federal government, 42 U.S.C. § 1437, to promote the construction and development of housing at rentals which persons of low income can afford, Barnes v. New York City Housing Authority, 16 Misc.2d 670, 184 N.Y.S.2d 314 (Sup.Ct. N.Y. Cty. 1959). The Public Housing Law created within the State's executive department a Division of Housing and Community Renewal (Division), administered by a Commissioner, §§ 10, 11, and vested with the exclusive power under §§ 154 and 156 to promulgate rules and regulations determining the level of rents to be charged in public low-income housing authority projects as well as the eligibility of different classifications of tenants for occupancy. See New York City Housing Authority v. Colon, 66 Misc.2d 654, 322 N.Y.S.2d 274 (N.Y.Civ.Ct.1971); Barnes, supra. Pursuant to this authority the Division has approved rentals in such projects for low income (1) non-welfare households, 9 N.Y.C.R.R. § 1627-5.1,[1] (2) welfare households, i. e., those receiving monetary public welfare assistance, 9 N.Y.C.R.R. § 1627-2.6(c)(5)(i),[2] and (3) non-welfare families who have welfare recipients in the household, 9 N.Y.C.R.R. § 1627-2.6(c)(5)(ii).
 
 
 3
 At issue in this case is the constitutionality of 9 N.Y.C.R.R. § 1627-2.6(c) (5)(ii), which provides:
 
 
 4
 (ii) Rent for a non-welfare family having welfare recipients in the household will be their normal rent plus a proportion of the fixed welfare rent applicable to the occupied apartment. The normal rent will be based on the income of the family of the tenant of record excluding any income or allowances of the welfare recipients. The proportion of the fixed welfare rent will be the ratio that the number of welfare recipients in the household bears to the total number of persons in the household.
 
 
 5
 Pursuant to §§ 1627-2.6(c)(5) and 1627-5.1, the Authority, with the Division's approval, has promulgated a rent schedule for its low-income housing projects in Rockville Centre under which low-income families with less than 5 persons of the following classifications pay the following monthly rentals for a 41/2-room (2 bedroom) apartment:
 
 Non-Welfare household $145
 Welfare recipient
 
 6
 household $182
 
 
 7
 Non-welfare family $145 plus a proportion
 
 
 8
 with welfare of the fixed welfare
 
 
 9
 recipients in rental applicable to
 
 
 10
 household the apartment for
 
 
 11
 each recipient
 
 
 12
 Each plaintiff-appellee and family resides as a month-to-month tenant in a 41/2-room apartment in a low-income housing project in Rockville Centre which is owned and operated by the Authority. Each tenant has non-welfare income but also has in the family unit members who receive public assistance grants. Appellee Ballard, for instance, has non-welfare income of less than $10,440 per year, which would entitle her, if she were living alone, to rent her 41/2-room apartment for $145 per month. However, she had living with her, as part of her two-person family unit, her daughter, who received monthly welfare assistance payments of $276 a month, of which $91, or one-half of the scheduled rent of $182 for welfare recipients for the apartment, is paid as a rent allowance by the Rockville Centre Department of Social Services (Social Services) pursuant to 18 N.Y.C.R.R. § 352.3,[3] which authorizes the Commissioner of the Department of Social Services to pay welfare recipients "a monthly allowance of rent in the amount actually paid."[4] The Authority therefore charges appellee Ballard a monthly rental of $236, computed by totalling $145 (her normal rent for the apartment if she occupied it alone as a non-welfare tenant or with a non-welfare family member) and $91 (the amount of welfare rent paid by Social Services to her daughter).
 
 
 13
 Appellee Hamilton, who earns non-welfare income of $58 per week, rents a 41/2-room apartment for herself and her four (4) grandchildren, for whom she receives from Social Services welfare benefits amount to $403 monthly, of which $145 (or 4/5 of the $182 monthly rent to welfare recipients for the apartment) represents rental allowances. Her rental is fixed by the Authority at $290, computed by totalling the $145 per month which she would pay if she occupied the apartment as a non-welfare household and the $145 monthly rental payments received from Social Services for the grandchildren who receive public assistance. It appears that the net result of this rent scheme, devised by the Housing Authority in consultation with the State Department of Social Services, is that non-welfare tenants residing with welfare recipients serve as conduits for a transfer of funds from the welfare authorities to the housing authorities.
 
 
 14
 Thus it is clear that under the rent schedule and regulation pursuant to which it has been adopted low-income families occupying the same size apartment in a public housing authority low-income project may be charged widely different rentals, depending whether they derive their income from welfare, non-welfare or mixed sources. On May 27, 1976, the two plaintiffs, seeking to sue as class representatives, filed a complaint pursuant to 42 U.S.C. § 1983 asking injunctive relief and a declaratory judgment to the effect that the rent schedule and regulation, 9 N.Y.C.R.R. § 1627-2.6(5)(ii), violate their Equal Protection rights under the Fourteenth Amendment by requiring them without any rational basis to pay higher rentals than low-income non-welfare tenants.
 
 
 15
 Judge Costantino ruled that appellants failed to demonstrate a rational basis for charging tenants like appellees a rent higher than that charged households with non-welfare recipients whose income (i. e., rent-paying ability) is equal to that of appellees. Judge Costantino also rejected the "conduit" rationale advanced by appellants on the ground that it was not "reasonable" for the public housing authority to use state and federal welfare funds to repay its federal housing loan, and it was inequitable to impose the burden of transferring funds from one agency to another on appellees, who are the tenants of record and legally responsible for the rent but do not directly receive welfare benefits.[5]
 
 DISCUSSION
 
 16
 Having recently been twice reminded by the Supreme Court of our duty to avoid constitutional issues if a case can be decided on other grounds, New York City Transit Authority v. Beazer, 440 U.S. 568, 582-584, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979) ("(W)e ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable"); Ulster County Court v. Allen, ---U.S. ----, ----, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) (courts "have a . . . strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration"), we must first determine whether the regulation might be interpreted in a fashion that would not present any constitutional issue. The possibility of such an interpretation is raised by the use of the words "normal rent" in the second sentence of the regulation, 9 N.Y.C.R.R. § 1627-2.6(c)(5)(ii), which might be construed to mean the rent which each of the plaintiffs would pay if living alone, unburdened of the necessity of caring for the welfare recipients in her family unit. If it were so interpreted, each plaintiff might then not normally require a 41/2-room apartment but could live in a smaller unit at a lower rental and the difference between the total rent paid by non-welfare and "mixed" households would be less. However, this interpretation would not entirely remove the difference in rents for families of the same size. Moreover, the regulation's use of the word "their" immediately before "normal rent" supports the interpretations given to it by the Authority and by the Division of Housing, which are entitled to considerable weight. E. I. du Pont de Nemours & Co. v. Collins, 432 U.S. 46, 54-55, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977). Accordingly, we see no way of avoiding the constitutional issue.
 
 
 17
 Both parties and the district court below agreed that the proper standard for determining whether there was an unlawful, discriminatory classification for rental purposes is whether any reasonable basis exists for the regulation and the rent schedule under attack. See Dandridge v. Williams,397 U.S. 471, 484-86, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). While this case does not present the typical challenge to a classification determining eligibility for a government benefit, see Clayborne v. Califano,603 F.2d 372 (2d Cir. 1979), since the issue here is a classification determining the cost to a user of a state-provided benefit in the form of public housing, we concur that the "rational basis" test is the appropriate standard for evaluating the constitutionality of the rental classification. For like the conditions on eligibility for a welfare benefit, the price charged the consumer of the benefit reflects an attempt to accommodate the needs for welfare assistance to the limited financial resources of the state. As we noted in Clayborne, supra, When there is no suggestion that the government has acted out of prejudice against a segment of society, we must respect the classifications adopted by the state as long as they are "reasonably believed to promote a legitimate (governmental) purpose." At 377. See Dandridge v. Williams, 397 U.S. 471, 485-87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Since the objective of the rent differential spreading the cost of public housing among those best able to absorb it is clearly a legitimate governmental purpose, the issue, to which we now turn, is whether the rental scheme is reasonably related to this purpose.
 
 
 18
 Appellants first attack Judge Costantino's conclusion that the difference in rentals for non-welfare and mixed households, respectively, denies equal protection, arguing that it is based on erroneous factual assumptions, namely, his conclusions that the named plaintiffs do not "have greater rent-paying ability solely because members of their households receive public assistance, a portion of which is designated as a shelter allowance" and that "it is the plaintiffs, and not the Department of Social Services, who are liable for the unpaid welfare portion of the rent." Although both household classifications (non-welfare and mixed) are in the low-income category, the district court's assumptions regarding their respective rent-paying abilities are not supported by the record. The record is clear that the rent that would have been charged to the plaintiffs if they had been the sole occupants or co-occupants with members not on public assistance would be $145 per month. According to appellants, the excess over this amount is paid by Social Services pursuant to 18 N.Y.C.R.R. § 352.3 to each plaintiff to be turned over to the Authority as the "amount actually paid" over and above the $145 per month. If this is the fact, each plaintiff would act as a conduit for transmittal of the increase and would not pay it out of income to which she would be unconditionally entitled. Under this hypothesis, if the additional shelter allowance portion of the rental were not "actually paid" to the Authority, the welfare assistance payment made by the Department of Social Services would be decreased by the amount of the rental allowance.
 
 
 19
 In Hammond v. Housing Authority, 328 F.Supp. 586 (D.Or.1971), relied upon by Judge Costantino, the court found that the unequal rent schedule, which charged higher rentals to welfare tenants than to working tenants, "was based on factors other than rent-paying ability," 328 F.Supp. at 588, and the public assistance tenants there had since 1964 received a flat welfare grant for all expenses, which was not based on the actual rent charged to the tenant. Moreover, although a portion of the welfare grants in Hammond Had, prior to 1964, been designated as a "shelter allowance," the tenants were not obligated to use it for rental but could keep for themselves any amounts not so used. No such finding was made here, where the welfare portion of the rent, according to appellants, is allocated for rental only pursuant to an agreement between the Division and Social Service agencies under 18 N.Y.C.R.R. § 352.3(e).
 
 
 20
 In Luna v. Housing Authority of the City of Los Angeles, 2d Civ. No. 42571 (Cal.App. Dept. Super.Ct., May 29, 1974), also cited by Judge Costantino, the California Superior Court affirmed a judgment holding unlawful a schedule charging higher rentals to public assistance tenants who received Flat grants based on theoretical need than to non-public assistance tenants. However, the judgment also provided:Nothing in this judgment shall prevent defendant Housing Authority of the City of Los Angeles or its agents from charging a public assistance tenant a rent surcharge when the amount of such surcharge does not exceed the amount of public assistance which said tenant would necessarily lose if the surcharge were not made and the surcharge is otherwise in strict compliance with the provisions of Public Law 91-152.
 
 
 21
 In affirming the judgment, the court furthermore noted the absence of any agreement between the California Department of Social Services and the Housing Authority similar to that claimed by the appellants to exist here, under which the actual rent paid would be included in the welfare grant, stating:
 
 
 22
 If such agreement were in effect at the time the flat rent payments were made to the plaintiffs, there would have been a rational basis for the classification. Any public assistance recipient whose rent was thereby fully paid would ipso facto have the ability to pay such rent. (Opinion, p. 13)
 
 
 23
 Each plaintiff-appellee here, unlike the plaintiff in Luna, would not suffer any loss as a result of paying the increased rental specified by the regulation and schedule for mixed households. However, the question remains whether, even assuming that the increased rent does not come out of funds that would otherwise be available to the tenant, the two rental classifications have any rational basis. Appellants argue that the increased rental subsidized by the State is aimed at enabling the Authority to meet the requirements of § 71.1(c) of the N.Y. Public Housing Law, which prohibits the Division from granting state aid for construction of a low-income housing project unless the estimated revenues from the project "will be sufficient to cover all probable costs of operation and maintenance, of fixed charges and operating and depreciation reserves." According to appellants the lower rents charged to non-welfare tenants would be insufficient, without the increased subsidized rentals paid on behalf of welfare recipients in mixed households, to satisfy § 71.1(c). Rather than increase rents across the board, which would work hardships on all tenants, including those on fixed incomes, the State chose, pursuant to an agreement between the Division and the Department of Social Services, to subsidize the amount needed to enable the Authority to comply with § 71.1(c) by paying it through the landlords to the Authority in the form of an increased rental for welfare recipients.
 
 
 24
 We agree with appellants that if, as they claim, the welfare and rent schedules interlock to transfer money from the State's Social Services agency to its Housing Authority, the rent differential would be reasonably related to its purpose. In these circumstances reducing appellees' rent to the flat $145 a month charged non-welfare households would trigger a reduction in the "shelter allowance" portion of the welfare assistance received by the other members of appellees' households since it would no longer be "actually paid" to the Authority. Consequently, appellees would not be disadvantaged by a scheme which used the welfare co-occupants as a conduit to transfer money from one government agency to another.[6] Although this might lead to a claim that the Social Services authorities were unconstitutionally discriminating between welfare recipients who do and those who do not share living quarters with a non-welfare recipient, to which the Social Services authorities might reply that it is reasonable for the State to conserve its limited welfare funds, the issue is not raised by this case and therefore we do not decide it.
 
 
 25
 If, on the other hand, as appellees contend, the welfare benefits received by those living with appellees are independent of the rent charged appellees, we would have reservations about the constitutionality of the rent differential. In these circumstances, the "housing allowance" would simply represent an accounting device, while the portion of the monthly welfare benefits allocated to it would in fact be spent at the discretion of the recipient just like any other portion of the benefits. However, unless and until this proves to be the case, we prefer not to rule on the constitutionality of the rent structure. As the Supreme Court pointed out in Dandridge, supra, 397 U.S. at 485, 487, 90 S.Ct. at 1161, 1162-63:
 
 
 26
 In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (31 S.Ct. 337, 55 L.Ed. 369). . . . We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, Goldberg v. Kelly, (397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. Cf. Steward Mach. Co. v. Davis, 301 U.S. 548, 584-585 (57 S.Ct. 883, 81 L.Ed. 1297); Helvering v. Davis, 301 U.S. 619, 644 (57 S.Ct. 904, 81 L.Ed. 1336.)
 
 
 27
 The record before us does not enable us to determine whether appellants have correctly characterized the operation of the welfare and rent schemes, upon which the constitutionality issue depends. Other than suggestions of appellants' counsel in their brief and in the affidavit of Assistant Attorney General Greenwald there is no evidence with respect to the following important questions of fact: (1) whether the increased rental for mixed households is wholly reimbursed by the Department of Social Services, rendering the plaintiffs mere conduits, (2) whether, if the plaintiffs failed to apply the reimbursements toward payment of the increased rental for the welfare recipients, the Department of Social Services would refuse to continue the increased rental payments to the plaintiffs or would pay the rental directly to the Authority as landlord; (3) whether, if the rentals for welfare recipients were reduced, the amounts paid by the Department of Social Services toward reimbursement would be reduced accordingly; and (4) whether the purpose of the increased rentals, which may be reimbursed for the welfare members of the mixed household under the regulations and rent schedule, is to enable the Authority to qualify for state aid under N.Y. Public Housing Law § 71.1(c).
 
 
 28
 We believe that these factual issues must be resolved before a determination can be made as to whether a rational basis exists for the difference in rental charges to non-welfare and "mixed" households. Accordingly, we reverse the order of the district court and remand the case to it for findings upon these issues after such evidentiary hearing, if any, as may be necessary and for a determination in the light of the findings whether a rational basis exists for the rent differential.
 
 
 
 [1]
 9 N.Y.C.R.R. § 1627-5.1 provides in pertinent part:
 (b) Rent schedules. (1) Rents to be assessed tenants are determined by reference to rent schedules adopted by the authority under the master management resolution. These rent schedules are known as schedule A, which lists rents based on admission incomes, and schedule B, which lists rents based on continued occupancy incomes. After ascertaining gross family income, reference to schedule A or B, as applicable, will show rent to be charged.
 (2) Rent schedules are established by the authority subject to division approval. The division will render assistance in the preparation of rent schedules upon request. Such schedules should have as their objectives:
 (i) The providing of sufficient revenues, which together with State subsidy, will meet the costs of efficient project operation, including reasonable reserves and debt payments.
 (ii) The establishment of rents within the means of low income families.
 
 
 [2]
 9 N.Y.C.R.R. § 1627-2.6(c)(5)(i) provides in pertinent part:
 (i) Rents for households all of whose members are covered by the monetary welfare assistance (whether full or supplemental) shall be determined in accordance with a schedule of fixed rents based upon the size, by number of bedrooms, of the dwelling unit occupied, but not in excess of the following schedule except when a modified schedule is approved by the New York State Department of Social Services and the division for a specific housing authority:
 Apartment size Monthly rent
(by the number of bedrooms) (dollars)
--------------------------- ------------
 0 65
 1 77
 2 90
 3 101
 4 107
 5 110
 
 
 [3]
 Mrs. Ballard's daughter went off welfare as of August 1, 1977
 
 
 [4]
 18 N.Y.C.R.R. § 352.3 provides in pertinent part:
 (a) Each social services district shall provide a monthly allowance for rent in the amount actually paid, but not in excess of the appropriate maximum of such district for each family size, in accordance with the following schedules:
 (e) An allowance for rent shall be made for recipients who are tenants of city, State or federally aided public housing in accordance with the following schedule except when a modified allowance is approved by the department for a specific housing authority:
 Apartment size Monthly rent
---------------- ------------
 "0" Bedrooms $ 65
 1 Bedroom 77
 2 Bedrooms 90
 3 Bedrooms 101
 4 Bedrooms 107
 5 Bedrooms 110
 When recipients of public assistance are residing with a nonpublic assistance tenant of record, the rent allowance shall be a pro rata share of the above rent schedule, or modified rent schedule.
 
 
 [5]
 Judge Costantino denied appellees' request for class certification, a ruling which has not been cross-appealed
 
 
 [6]
 This assumes that appellees would rent the same size apartment they presently rent whether or not they shared quarters with welfare recipients. If appellees would otherwise rent a smaller apartment, with a lower rent, they are disadvantaged by the combined effect of the rent and welfare schemes inasmuch as appellees assume an additional rent burden not offset by the housing allowances paid to the welfare recipients co-occupying the apartment. In such event, the shelter allowances for the latter would only compensate for the rent in excess of the higher base rent for the larger apartment. This burden could be avoided if the rent were fixed as the sum of the rent the non-welfare tenant would pay were she living in a smaller apartment without welfare tenants, plus the pro rata share of the welfare rent for the larger apartment actually occupied, the latter addend being the housing allowance paid to the welfare recipients by the welfare agency. However, as the Court noted in Dandridge, "(W)e do not decide today that the (New York) regulation is wise, that it best fulfills the relevant social and economic objectives that (New York) might ideally espouse, or that a more just and humane system could not be devised." 397 U.S. at 487, 90 S.Ct. at 1162. The increment in base rent paid by appellees is the price they must pay for assuming the responsibility for care of members of their families. We cannot say that New York has deprived appellees of equal protection because it has decided to impose this burden upon them